IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


United States of America,

v.                                        Case No. 1:24-cr-288-MLB

Jabez Marshall,

                    Defendant.

_____/


**ORDER**

A grand jury indicted Defendant Jabez Marshall, charging him
with two counts of producing child pornography and one count of
distributing child pornography.  (Dkt 20.)  He filed motions to suppress
statements he made to law enforcement immediately following his arrest
and after he executed a *Miranda* waiver form.  (Dkt 41.)  He also moved
to suppress three search warrants—one for the search of his home, one
for the search of his person and phone, and one for the search of his
Snapchat account.  (Dkts. 42, 43, 46.)  The Magistrate Judge issued a
Report and Recommendation, saying this Court should deny all of his
motions other than suppressing statements he made after his arrest but

before signing the *Miranda* waiver.  (Dkt. 74.)  Marshall filed objections.  (Dkt. 76.)  For the reasons set forth below, the Court overrules Marshall's objections and adopts the Report and Recommendation.

## I.    Standard

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made."  Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 694 (11th Cir. 2020)[1]; *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with.").  "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

---

[1] The Court recognizes *McCullars* is unpublished and not binding.  The Court cites it and other unpublished cases as instructive, nonetheless. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

"It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). And, in most cases, "[a] party failing to object to [an R&R] waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 472 (11th Cir. 2016). Ultimately, whether or not objections are filed, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## II.    Background

In August 2025, FBI agents arrested Defendant Jabez Marshall pursuant to an arrest warrant charging him with using a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct in violation of 18 U.S.C. §§ 2251(a) and (e).[2]  A

---

[2] Marshall seeks to incorporate his "factual and legal citations and arguments" from several prior filings "as if set forth herein." (Dkt. 76 at 3.)  The Court does not consider those.  It considers only the specific objections he raises in his objections to the R&R. *United States v. Matthews*, 2024 WL 688666, at *2 (N.D. Ga. Feb. 20, 2024) (Brown, J.) ("[W]hen a party merely makes general objections, such as incorporating

video of the arrest shows 5 agents approaching Marshall from different directions as he walked down the street.[3] (Dkt. 82.) Marshall contends the agents were wearing "military-style, camouflage, battle dress uniforms, complete with vests." (Dkt. 76 at 4.) Leaving this characterization aside, it's more accurate to say they were wearing jeans or casual pants, t-shirts, baseball hats, and FBI tactical vests. (Dkt. 82.) Each agent had an assault rifle and sidearm. (Dkt. 82 at 4:20.) The agents ordered Marshall to the ground and told him to put his hands behind his back. (*Id.* at 4:30.) He complied.[4] (*Id.*) Agents handcuffed

---

by reference other arguments made in prior briefs, the objecting party does not receive a de novo review."); *United States v. Middleton*, 595 F. Supp. 3d 1277, 1283 (N.D. Ga. 2022) (Batten, J.) ("[A] party does not state a valid objection to an R&R by merely incorporating by reference previous filings. . . . Because [defendant's] objections were general and merely incorporated their prior briefing, the Court will overrule them."). Marshall also begins his objections with a statement that agents arrested him on August 8, 2025–but that happened on August 8, 2024.

[3] Marshall contends nine to twelve agents were "on the team" that morning and that seven "were tasked with arresting him." (Dkt. 76 at 3, 4.) The video shows five actively involved in his arrest with Special Agents Norris and Dervish arriving moments after. Nothing about the number of agents involved suggests an excessively coercive atmosphere.

[4] Marshall says one agent pointed his rifle "directly *into* Marshall's back" as he lay on the ground. (Dkt. 76 at 4 (emphasis added).) He includes a still-photo from the arrest video that he says shows this moment. (*Id.*)

him, pulled him up by his arms, led him across the street, and sat him on a wall.  (*Id.* at 5:25.)

The lead investigators, Special Agents Dervish and Norris, joined Marshall and the other agents.  They had a warrant to search Marshall's phone and apartment.  Without advising Marshall of his *Miranda* rights, they questioned him about the apartment, specifically confirming he lived in Unit 4 and asking whether there were people or weapons in the home.  (*Id.* at 7:01-7:24.)  Marshall said his father was home but he did not have his father's phone number and did not know whether his father had a firearm.  (*Id.*)  Special Agent Norris told Marshall he was going to enter the home to execute the search warrant, said he wanted to go in "without having to hurt anyone," and asked if he could contact Marshall's

---

That's hard to see and totally out of context.  It appears that, while the agent was straddling and handcuffing Marshall, he positioned his rifle to point behind his own leg and away from Marshall.  The video does not have a great view so it's possible that, while getting into position to handcuff Marshall, the agent pointed his rifle at Marshall's back for a split second as he was moving it.  After that, the agent allowed his rifle to hang on a sling while he used both hands to cuff Marshall before putting his hand back on the rifle and directing it beyond Marshall's legs. The agent certainly did not point the gun "into" Marshall's back or hold Marshall at gunpoint as Marshall seems to suggest.  A quick and easy arrest.

father to ask him to come outside because "that way we don't have to kick the door and do the whole crazy thing that you see on tv." (*Id.* 7:30-7:58.) Special Agent Norris also said, "that's where people start getting hurt." (*Id.*)

Marshall suggested calling his mother to have her contact his father but said he did not have her number. When Special Agent Norris asked Marshall if he had his cell phone, Marshall gestured to his front pocket. (*Id.* at 8:16.) One of the arresting agents took the cellphone from Marshall's pocket and gave it to Special Agent Norris.[5] (*Id.*) He asked

---

[5] Marshall says this was the same agent "who pointed his assault rifle directly into Marshall's back minutes earlier" and that "while [getting Marshall's phone] the agent was still holding the assault rifle by the pistol grip with his index finger resting on the magazine well, right next to the trigger." (Dkt. 76 at 7.) The Court has already addressed the claim the agent pointed his rifle into Marshall's back while handcuffing him. The claim the agent held his rifle by the pistol grip with his finger next to the trigger is also not accurate. The entire event is included in the video. (*Id.* at 8:20-9:50.) The agent never touched his rifle as he approached Marshall to get the phone and used both hands to fish the phone from Marshall's pocket (as Marshall was sitting down). He put his hand on his weapon for a split second as he stepped back after getting the phone, apparently to stop the rifle (which was hanging by a sling) from swinging. He then stood to the side with his hand on the pistol grip until Marshall asked the agent to take out Marshall's headphone and the agent again approached to get a headphone case from Marshall's pocket. When he had to use both hands, he again removed his hand from the weapon. After that, he stood with both hands to his side and his weapon hanging across his leg, before walking away to speak with a patrol officer

6

Marshall to unlock the phone and identify his mother's number. (*Id*. at 8:58-9:35.)  Special Agent Norris called Marshall's mother and, while sitting next to Marshall, told her about the warrant, that they were going to have to go into the apartment, that they wanted to do it as safely as possible, that they wanted the father to come out before they entered, and that they wanted his phone number. (*Id*. at 10:33-11:20.)  After a pause when the mother must have been asking questions, Special Agent Norris reiterated that they wanted to enter the apartment as safely as possible, did not want to have to "break doors and do all the crazy stuff you see on tv," and wanted to give them the opportunity "not to damage any property." (*Id*. at 11:30-12:58.)  He said they wanted to do it "safe and easy." (*Id*.)  At that point, Marshall offered the key to the apartment, and an agent took it to execute the search warrant. (*Id*. at 12:40-13:00.)

Marshall remained on the wall, handcuffed, while agents went

---

across the street.  At no time during this interaction did the agent point his rifle anywhere close to Marshall or brandish it in any way.  His movements of placing his hand on the pistol grip from time to time were subtle and, to the Court, appear the movements of a well-trained officer acting naturally rather than to intimidate anyone.  The Court rejects any suggestion the agent acted in an aggressive, hostile, or threatening manner.

through his backpack and spoke with him, mostly about his relationship with his parents, the time he had to be at work, how he got to work, how he was feeling, why they were searching his person and backpack, and that they would allow him to leave personal items at home before taking him to jail. (Dkt. 81 at 13:30-15:00.) At one point, Marshall became dizzy so the agents gave him water and (a bit later) took him in their air-conditioned car to his home so he could change clothes. (Dkts. 81 at 18:55-19:20; 22:26-23:25; 60 at 24.) Special Agent Dervish testified that, before driving Marshall to lockup and after letting him change, they briefly removed his handcuffs so they could place his hands in front of his body and connect the handcuffs to a belly band. (Dkt. 60 at 23-24.)

Marshall was in custody for about 30 minutes when Special Agent Dervish placed him in the back seat of Special Agent Norris's car for transportation to lockup. (*Id.* at 29:08.) She sat next to him. (Dkt. 60 at 24.) Special Agent Dervish either had her firearm in her holster or locked it away. (*Id.* at 51.) She never brandished it.[6] (*Id.*) While waiting for

---

[6] Marshall says she wore her firearm despite Special Agent Dervish's testimony that she could not recall if she had locked it in the trunk of her car (as she does sometimes for safety reasons while transporting arrestees) or was still wearing it. (Dkt. 60 at 25, 51.)

Special Agent Norris to get in the car, Special Agent Dervish explained she was going to read Marshall his *Miranda* rights, explaining "I wanna make sure you know and understand your rights before we ask any questions because it's really important that, that you're clear on all of that." (Dkt. 81 at 29:45.) Special Agent Dervish asked Marshall background questions, like his name, date of birth, education, whether he had taken any controlled substance, explaining she was doing this to make sure he could understand their conversation and his rights. (*Id.* at 30:30.) She then read him the *Miranda* warning:

> Dervish: So I'm gonna read these to you, and then if you can just acknowledge that you understand after each one, that would be great. All right. So before we ask you any questions, you must understand your rights. So you have the right to remain silent. Do you understand that?

> Dervish: Do you mind saying yes?

> Marshall: Oh yes.

> Dervish: Thank you. Anything you say can be used against you in court.

> Marshall: Yes ma'am.

> Dervish: You have the right to talk to a lawyer for advice before we ask you any questions.

> Marshall: [Not clear].

Dervish:    You have the right to have a lawyer with you during questioning.

Marshall:   Yes ma'am.

Dervish:    And if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Marshall:   Oh, Yes ma'am.

Dervish:    Also, and this is really important. If you decide to talk to us, but then you decide to answer the questions now without a lawyer, you can stop answering at any time. So if I ask you something and you're like, I don't want to answer that question, that's fine. We'll move on. I'm not gonna make you say anything. If you say you don't want to talk at all, also fine. I'm like, Josh said it's not a movie. We're not gonna beat anything out of you. I think so far you've been very respectful. We've tried to be respectful. We'd like to keep that going.

Marshall:   Mm-hmm.

Dervish:    So this is, this just says I have read this statement of my rights and I understand what my rights are at this time. I'm willing to answer questions without a lawyer present.

Marshall:   Sure.

Dervish:    Okay. Um, <laugh>, can you sign that?

(*Id.* at 31:00-32:23.)  Marshall signed the *Miranda* form, acknowledging he had read the statement, understood his rights, and was willing to

10

answer questions without a lawyer present.  (Dkt. 77-2.)[7]

After considerable questioning from Special Agent Dervish, Special Agent Norris began asking questions.  Apparently thinking Marshall was not being forthcoming, he said:

> Okay. So as [Dervish] mentioned these things in our experience, right? No promises these things, the judge is going to ask you guilty, not guilty just in a little bit, right? Just because you tell us right now doesn't mean that you're guilty, right? But we need some closure for these victims. We need to know if there's other victims. We need to know what's going on with these kids, right?

(Dkt. 81 at 59:00-59:26.)  A few minutes later, Special Agent Norris made another statement:

> We're trying to give you the olive branch here. Once we, once we leave this and things change, they change, right? If we can go to the judge and the United States Attorney's Office and be like, Hey, Jabez was awesome dude, he made a mistake. That matters, right? It's not gonna mean that you're gonna get off

---

[7] Marshall contends Special Agent Dervish "extracted a waiver at the scene in the back of a hot FBI car." (Dkt. 76 at 16.)  That's not true. Special Agent Dervish testified that, when they first got in the car, the air conditioning was not running. (Dkt. 60 at 70-71.)  So it must have been hot.  Indeed, she remarked on the recording that she "did not think [Special Agent Norris] was going to leave [them] in a hot car." (Dkt. 81 at 29:26.)  But she also testified that, when Special Agent Norris started the car, he turned on the air conditioning and the temperature was not uncomfortable.  (Dkt. 60 at 71.)  And that happened one minute after Marshall and Special Agent Dervish got into the car and before she read him his *Miranda* rights.  (Dkt.  81 at 30:01.)

scot-free because you're in handcuffs in the back of an FBI vehicle. It is what it is at this point, right? We're both men here. We can speak frankly.

(*Id.* at 1:00:15-10:00:45.)  After further discussion about the specifics of Marshall's alleged communications with a victim and after Marshall claimed not to remember many things, Special Agent Dervish gave Marshall the victim's first name and her online usernames, prompting this exchange:

Marshall: Yeah, I can't remember that. I'm, maybe I'm not just good with the names. I'm better off at the visuals. I do apologize if I did because I don't like that kind of stuff. I like doing things, but I honestly just don't remember. I don't remember talking to nobody at that age and I don't remember the name.

Dervish: Okay.

Marshall: Yeah, I plead the fifth because <laugh>. Yeah 'cause that's me, that's my name and stuff. So I can't sit here and say somebody took my stuff and did it 'cause I don't know if they did. So I told me auntie, I'll be honest here I'm, I would rather just tell him that the I'm guilty because I don't know if somebody else did it. And to be honest, I don't want to go to jail for nobody or anything. And even if I can try to prove my innocence, I can't remember that girl. So I don't remember the like, the stuff.

Dervish: Okay. And you're gonna have an opportunity to, you know, try to prove your innocence. I will tell you that based on the information that we have back from Instagram and Snapchat, the account is

12

> registered to your name, to an email address that
> I believe is either Jabez Marshall at gmail or
> Jabez.Marshall at gmail. The phone numbers are
> registered to you and the IP login, you know what
> that is, right? When you connect to the internet. It
> comes back to an IP that is registered to your
> mom's name.

Marshall:  Oh, her apartment?

Dervish:  Yeah, correct.

(*Id.* at 1:11:45-11:13:53.)  Marshall then provided the agents with his phone passcode.  (*Id.* at 1:14:05-1:14:21.)  The agents ended the interview a few moments later.

## III.  Motion to Suppress Statements

Marshall moved to suppress his statements arguing the agents coerced him into signing the waiver and otherwise said things during the interview that rendered his statement involuntary.  The Magistrate Judge held a hearing and allowed post-hearing briefing before issuing the Report and Recommendation saying this court should deny Marshall's motion.

### A.  Valid Miranda Waiver

"Before the [United States] can introduce a defendant's uncounseled, self-incriminating statements made during a custodial

13

interrogation, the [United States] must show that the defendant knowingly and voluntarily waived his [or her] *Miranda* rights[.]" *Schoolcraft v. Warden, G.S.P.*, 2023 WL 7014049, at *3 (11th Cir. Oct. 25, 2023). It must make this showing by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The "knowing" element requires the United States to show the defendant's waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception" while the "voluntary" element requires it to show the defendant made the waiver "with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (internal quotation marks and citation omitted). A waiver is thus effective where the "totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

The Magistrate Judge concluded that, despite the tense situation

arising from Marshall's arrest and the search of his home, the United States presented evidence establishing Marshall knowingly and voluntarily waived his *Miranda* rights. Marshall objects and argues (as he did before the Magistrate Judge) the totality of the circumstances— being arrested at gunpoint, placed in handcuffs, and having to answer questions about who was in his home—created a coercive environment. Marshall includes several alleged "facts" that he says added to the "coercive environment." (Dkt. 76 at 12.) That includes his unfair characterizations (discussed above) about the agent allegedly pointing his assault rifle "into" Marshall's back during the initial arrest and then holding his finger near the trigger while retrieving Marshall's phone as well as his inaccurate claim (also discussed above) that Special Agent Dervish presented the *Miranda* waiver when Marshall was in a hot car. (*Id.*)

He adds a claim that Special Agent Norris made "a clearly implied threat expressed to Marshall and his mother——that people and property would be harmed without cooperation." (Dkt. 76 at 10.) He says Special Agent Norris "stated to *both* Marshall and his mother that, if they did not cooperate and facilitate their entry into an empty apartment, agents

would 'break doors and do all the crazy stuff you see on tv'" and "*twice*
stated that he did not want to hurt anyone by going in with force." (Dkt.
82 at 7:36-8:02).  Marshall argues "the prospect of 'not having to hurt
someone' and then blithely offering the peaceful option of cooperation"
created the coercive situation.

The Court rejects this argument for two reasons.  First, this is an
unfair characterization of the special agent's statements and totally
devoid of context.  The arrest video shows the agents were having a calm
conversation with Marshall about their intention to enter his home to
execute a search warrant and their desired to minimize any difficulty—
like conducting a forced entry—by contacting Marshall's father and
asking him to come out of the house.  No part of that conversation with
Marshall or his mother could plausibly have been construed as a threat
or as anything other than the agents trying to explain they wanted to get
the father out of the apartment before having to enter.  Second, this
conversation happened 30 minutes before Special Agent Dervish spoke
with Marshall about his *Miranda* rights.  That is more than enough time
for the excitement of the initial (and rather mundane) arrest to have
dissipated.  *United States v. Johnson*, 379 Fed. App'x 964, 969 (11th Cir.

16

2020) (finding allegedly coercive actions of crying children, handcuffs, and battering down a door had dissipated in 30 minutes prior to *Miranda* warning).

In the end, Marshall's claim of a coercive environment rests on the fact that five agents arrested him at gunpoint, placed him in handcuffs, and searched his home before presenting the *Miranda* waiver. None of that shows coercions beyond the level necessary to effectuate nearly any arrest. *United States v. Garcia,* 890 F.2d 355, 362 (11th Cir. 1989) (large number of officers does not establish coercions absent evidence that officers employed tactics "to augment the degree of coercion that is inherent in any arrest"); *Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) ("The use of handcuffs does not establish coercion."). To hold that conduct excessive would render even the most rudimentary arrests so coercive as to render any subsequent waiver involuntary.[8]

Furthermore, no evidence suggests the circumstances of the arrest had any coercive impact on Marshall. As the Magistrate Judge noted,

---

[8] Marshall criticizes the agents for not taking him "to a neutral location, away from the scene, to allow him time to process the emotions and fear of what had just happened" before seeking to interview him. (Dkt. 76 at 16.) He cites no authority suggesting that step was required.

both the arrest video and Special Agent Dervish's audio recording show Marshall's tone was calm and conversational throughout his involvement with the agents. (Dkt. 74 at 12.) Marshall attacks that conclusion saying "speculation about demeanor is unhelpful given the various responses people offer in the face of force and fear." (Dkt. 76 at 12.) But the Court must consider the totality of the circumstances and that includes Marshall's reaction—or perceived reaction—to what was happening. He certainly did not seem upset, agitated, scared, or overborn with emotion. To the contrary, he seemed calm and rational throughout, wanting to call his employer, asking agents to remove his ear pods, and otherwise being in control of himself. As discussed, he became dizzy at one point after his arrest—perhaps because of the situation or perhaps because of the heat. (Dkt. 76 at 8.) The agents helped him, and nothing suggests his discomfort lingered.

Both the signed form and Special Agent Dervish's audio recording indicate Marshall understood his rights and voluntarily agreed to waive them. In support of that conclusion, the Magistrate Judge found that "[a]t the time Special Agent Dervish administered the warnings, no weapons were drawn, her firearm remained holstered or secured, the

tone of the interaction was conversational rather than confrontational," and no evidence suggests Marshall was confused about his rights. (Dkt. 74 at 12, 15.) Marshall objects, arguing the circumstances "demonstrates a mechanical, command-and-control formality and compliance, not a free and voluntary waiver." (Dkt. 76 at 12.) To support this, he notes the agent did not hand him the form to read himself but rather read it to him, thus suggesting "passive compliance." The Court disagrees. Special Agent Dervish went through each portion of the waiver to ensure Marshall understood its contents. He said he understood and signed the form. No evidence suggests Marshall felt compelled to comply.

Marshall also notes that—at the start of the exchange—Special Agent Dervish said "do you mind saying yes." (Dkt. 76 at 13.) Marshall challenges the Magistrate Judge's acceptance of Special Agent Dervish's testimony that she was not "instructing him to say yes" but instead was telling him he had to answer verbally after Marshall "nodded affirmatively." (Dkt. 74 at 13.) Marshall says this Court should not accept that testimony because (1) there was no "pause" between her saying "do you understand that?" and her saying "do you mind saying yes" and (2) Special Agent Dervish "concede[s] she did not know if

Marshall perceived her instruction to say 'yes' as a directive." (*Id.* at 13-14.)  Marshall says this exchange suggests Special Agent Dervish was telling him to say yes (rather than thinking about what he wanted to do) and that, in response, he "mechanically" answered "yes ma'am" to each subsequent question.  (*Id.*)  So he says that one statement infected the entire colloquy.

Having listened to the audio recording, the Court overrules this objection.  There is a sufficient pause or break in the conversation for Special Agent Dervish to have reacted to Marshall nodding as she was reading the form.  Special Agent Dervish recalled this event without hesitation, saying she had a "specific recollection he was nodding." (Dkt. 73 at 8, 12.)  And she said she did not know Marshall's perception in response to a leading question.  That answer does not undermine her testimony that he nodded affirmatively.  The recording also does not suggest a mechanical response by Marshall.  The agent read each paragraph of the form slowly (pausing appropriately), and Marshall answered each time.  The Court concludes Special Agent Dervish's explanation is "the most natural understanding of what happened." (Dkt. 74 at 13.)

20

Marshall also attacks the final part of the Miranda discussion, specifically Special Agent Dervish's statement amidst a laugh "Okay, can you sign that?" Marshall suggests Special agent Dervis was "directing" him to sign rather than giving him the option of doing so. (Dkt. 76 at 14.) The Magistrate Judge—after questioning Special Agent Darvish himself—accepted her testimony that, when she said "can you sign this," she was not instructing him to sign but rather was asking if he was physically capable of doing so since his hands were cuffed and attached to a belly band. (Dkt. 74 at 10.) He also accepted her testimony that she laughed because "the way that [Marshall] was holding the paper and the way his hands could move because of the handcuffs and the belly band, it was just a difficult position for [them both] to be in." (Dkt. 60 at 28.) Marshall objects saying this explanation "is not credible" but offers no explanation or any evidence to contradict the agent

The Court disagrees. Before this exchange, Special Agent Dervish read the "consent" portion of the *Miranda* form, saying "So this just says 'I have read this statement of my rights and I understand what my rights are at this time. I'm willing to answer questions without a lawyer present." (Dkt. 21 at 32:00.) Marshall paused for several seconds before

21

answering "sure." (*Id.* at 31:15.) So he unequivocally waived his rights before the agent said "can you sign here." And the laughter corroborates the strange situation that caused her to ask if he could sign.

The Court overrule Marshall's objections and adopts the magistrate Judge's conclusion that the United States has shown Marshall knowingly and voluntarily waived his *Miranda* rights.

### B.    Voluntariness of Marshall's Statements

Beyond *Miranda*, a Court cannot allow the United States to use a defendant's post-arrest statement at trial unless it finds the defendant made that statement voluntarily. *Jackson v. Denno*, 378 U.S. 368, 378 (1964) ("[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession[.]"). This looks to the totality of the circumstances, including the lengthy of the interrogation, the defendant's education, intelligence, and maturity, and whether law enforcement made any misrepresentations, threats, or promises to induce the statement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003). The ultimate question is whether a defendant's statement was the product of "an essentially free and

unconstrained choice." *Garcia*, 890 F.2d at 355. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted).

Marshall moved to suppress his post-waiver statement as involuntary and the product of coercion, citing Special Agent Norris's alleged pressure tactics near the end of the interview, the continuation of questioning after Marshall said, "I plead the Fifth," Special Agent Dervish's alleged suggestion Marshall would have to "prove his innocence," and false information Special Agent Dervish gave about an IP address. (Dkt. 63.) The Magistrate Judge rejected each argument and Marshall objects to those conclusions.

Marshall first attacks Special Agent Norris's statements that, while Marshall would have to go before a judge "in a little bit" to say if he was guilty or not guilty, "[j]ust because you tell us right now, doesn't mean that you're guilty, right?" Marshall contends this was coercive and deceptive because it led Marshall to believe he could confess and still be

not guilty. He says this representation was "no different that telling an accused that the conversation is 'confidential' . . . or that the accused can speak 'of the cuff.'" (Dkt. 76 at 18-19.)

The Eleventh Circuit has held that false assurances to a defendant that law enforcement will not use the defendant's statement against him or her renders any subsequent statement involuntary. *United States v. Lall*, 607 F.3d 1277, 1285–87 (11th Cir. 2010). But—contrary to Marshall's insistence—that is not what happened here. As the Magistrate Judge noted, Special Agent Dervish had already told Marshall that anything he said could be used against him. In the portion of the statement at issue, Special Agent Norris explained he would like to tell the judge that "[Marshall] was awesome dude, he made a mistake." (Dkt. 81 at 1:00:33) He continued: "That matters, right? It's not gonna mean that you're gonna get off scot-free because you're in handcuffs in the back of an FBI vehicle. It is what it is at this point, right?" (*Id.* at 1:00:40.) So the agent told Marshall he would tell the judge if Marshall cooperated but Marshall would not get off scot-free.

In his objections, Marshall says none of that context matters because Special Agent Norris was still telling Marshall he could confess

and still not be guilty.  (Dkt. 76 at 20.)  But that's not what he said.  He said he could provide them the information they wanted (which focused on the identity of potential victims) and still plead not guilty.  And that was true.  Marshall could not have believed speaking to the agents would guarantee a favorable outcome or that what he said would not be used against him.  This was not a deceptive or coercive statement.

Marshall next argues the agents should have stopped all questioning when he said "I plead the fifth."  "When a person undergoing a custodial interrogation states that he [or she] wishes to remain silent, the questioning must end."  *United States v. Ochoa*, 941 F.3d 1074, 1098 (11th Cir. 2019).  A suspect's invocation of his rights, however, must be unequivocal, meaning it must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be* a request [by the suspect] to exercise his [or her] right to remain silent and terminate the interrogation, not that it *might be* a request to remain silent."  *Owen v. Florida Dept. or Corrections*, 686 F.3d 1181, 1194 (11th Cir. 2012) (internal citation and quotations omitted).

The Magistrate Judge concluded Marshall's statement was not unequivocal because, immediately after saying "I plead the fifth," he

continued speaking at length. (Dkt. 74 at 19.) So, the Magistrate judge concluded Marshall's statement "appears less like an unequivocal invocation and more like a colloquial expression of frustration or uncertainty, followed by a voluntary continuation of dialogue." (*Id.*) Marshall objects, insisting this was a clear invocation. (Dkt. 76 at 20.) Marshall suggests the agents had to interrupt him immediately and stop him from talking further because "the burden is not in the defendant to cease the dialogue." (*Id.* at 22.) Marshall cites no authority for this contention. Marshall also claims the Magistrate Judge erred in relying on *United States v. Dawes*, 495 F. App'x 117 (2d Cir. 2021), for the proposition that "context matters" in assessing whether Marshall was invoking his right to end the interview because the defendant in *Dawes* mentioned his Fifth Amendment rights before agents read him his *Miranda* rights. (Dkt. 76 at 22.) But context must matter. The Eleventh Circuit in *Owen* found it was reasonable for a state court to conclude a defendant's statement "about not wanting to 'talk about it'—which were isolated statements, made nearly 30 minutes apart, in response to questions about very specific details, in the midst of a give-and-take discussion of the evidence against [the defendant]—did not constitute an

26

*unequivocal* invocation of [the defendant's] right to remain silent." 686 F.3d at 1194 (assertion must be unequivocal considering "the circumstances"). It considered context. The Supreme Court has recognized the same. *See also Davis v. United States,* 512 U.S. 452, 459 (1994) ("if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer ***in light of the circumstances*** would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation") (emphasis added).

In the circumstances, Marshall's statement "I plead the Fifth" was not an invocation of his right to end the interview. Not even close. Not only did he blow right past this reference and continue talking, the context of the exchange shows he was not expressing any desire to stop talking. The agents explained that, although Marshall claimed not to know a certain victim, they had evidence he obtained videos from her via his social media accounts. Marshall responded by explaining he did not recognize the name, volunteered "I plead the fifth," and clarified he said that because he could not explain away incriminating information on his social media accounts. Under these circumstances, no reasonable officer

27

would have believed Marshall was invoking his right to end the interview.

Marshall next argues the agents coerced him when Special Agent Dervish said he would "have an opportunity to, you know, try to prove [his] innocence." (Dkt. 76 at 23.) Marshall says the agent made that worse by immediately telling him his efforts would be "futile" because the Instagram and Snapchat accounts (which allegedly contained evidence of the crime) were registered in his name, included his email, had phone numbers registered to him, and used an IP address "registered to [his] mom's name." (*Id.* at 24.) The part about the IP address was untrue because (as discussed below) law enforcement had not linked the primary Instagram account to Marshall's mother's home.

The Magistrate Judge concluded that, in context, the agent was "mirroring" Marshall's words when she said he could try to prove his innocence rather than trying to mislead Marshall about the burden of proof in a criminal case. (Dkt. 74 at 20.) The Court agrees. Marshall had just said that "even if I can try to prove my innocence, I can't remember that girl," and the agent was using that context to tell Marshall he would have an opportunity to do that (prove his innocence)

28

but she wanted him to know the evidence they already had against him. (*Id.*) Marshall does not really respond to this other than saying the agent cannot "be absolved of responsibility" for the statement given her experience and training. (Dkt. 76 at 27 n.10.) He cites no authority that a statement like this—in the context of responding to a suspect's choice of words—amounts to coercive behavior. The agent's statement did not suggest Marshall's statements would not be used against him or otherwise try to mislead him about the legal process. She was being conversational to his diction. The Court overrules this objection.

The Magistrate Judge also rejected his claim that the agent's misstatement about the IP address rendered his statement involuntary. The Magistrate Judge concluded law enforcement's misrepresentations of fact—even if deliberate—are "not enough to render a suspect's ensuing confession involuntary." (Dkt. 74 at 22 (*citing Lall*, 607 F.3d at 1285).) He further concluded that, in the light of the other (accurate) evidence the agent provided, the statement about the IP address did not unduly deceive or coerce Marshall into making any statement. (*Id*. at 29.) Marshall acknowledges this precedent but says his case is different because "the misrepresented evidence was objective data from an ISP,

29

seemingly foreclosing any claim that a third party may be responsible." (Dkt. 76 at 25.)  He says his case is "the essence" of what the Eleventh Circuit found coercive in *Lall*.  Not so.  In that case, the officers promised the defendant they would not use his statement against him.  697 F.3d at 1287.  The misstatement about the IP address is not similar and did not render the interview coercive.

As a final objection, Marshall contends that the totality of all these circumstances created a coercive environment.  The Court disagrees. None of these individual circumstances created any kind of coercive situation and the sum of their parts is no greater (at least not here).

## C.    Conclusion

Having reviewed the arrest video, Special Agent Dervish's audio recording, and the transcripts from the evidentiary hearings, the Court overrules Marshall's objects, concludes Marshall knowingly and voluntarily waived his *Miranda* rights and voluntarily continued speaking with the agents, adopts the Magistrate Judge's recommendation, and **DENIES** Marshall's motion to suppress his post-

*Miranda* statements.[9]

## IV.   Marshall's Motion to Suppress the Seach of His Home

As already explained, Marshall lived at 379 Atwood Street with his mother and father.  Agents obtained a search warrant for the apartment for evidence related to the production, possession, receipt, and distribution of child pornography and the enticement of a minor.  (Dkt. 43-1).  The parties agree Special Agent Dervish's affidavit inaccurately stated the IP address data for Marshall's "chill.beezy" Instagram account—which he allegedly used to communicate with the primary victim in this case—"resolved" to Marshall's mother's home at the Atwood Street address when that was not true.  In fact, the IP address for two of Marshall's other Instagram accounts "unknown_beezy" and "beezy_braclets" resolved to that address.  (Dkt. 74 at 27.)  Marshall moved to suppress the search, arguing the warrant failed to establish a constitutional nexus between criminal conduct and the residence, the information in the warrant affidavit was stale, and the warrant was a

---

[9] The Magistrate Judge concluded the United States did not intend to introduce any of his post-arrest, pre-*Miranda* statements.  The United States has not objected, and the Court adopts that conclusion.

"general warrant." (Doc. 43.) He also moved for a *Franks* hearing as to whether Special Agent Dervish intentionally misled the issuing magistrate judge. (Dkt. 48.) The Magistrate Judge refused a *Franks* hearing and recommends the Court deny her other attacks on the warrant. Marshall objects.

### A.   *Franks* Hearing

A search warrant may be voided if the affiant deliberately or recklessly included false statements or failed to include material omissions that were essential to the finding of probable cause. *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002). In order to obtain a so-called *Franks* hearing to explore this issue, a defendant must "make a substantial preliminary showing that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006). So "even in the face of a deliberate omission, no hearing is required when there was enough evidence to support a probable cause finding even after considering the effect of the omission" *United States v. Leonard*, 4 F.4th 1134, 1147-48

(11th Cir. 2021).

### 1.   Substantial Preliminary Showing

The Magistrate Judge concluded Marshall failed to make a substantial preliminary showing.  He objects and insists he did that by (1) establishing that the misrepresentation was "material to the finding of probable case" and (2) alleging the agents acted deliberately or recklessly.   He claims "recklessness can be inferred when the misrepresentation or omission significantly impacts probable cause." (Dkt. 76 at 29-30.)  Marshall cites out of circuit cases for that proposition but no Eleventh Circuit authority.  To the contrary, the Eleventh Circuit has explained negligent misstatements or omissions are not enough to obtain a hearing, *United States v. Whyte*, 928 F.3d 1317, 1332 (11th Cir. 2019), and obviously negligent omissions can be material.  And, even if recklessness can sometimes be inferred from the importance of the false information, that would not carry the day here.  As discussed in more detail below, the warrant had plenty of other information to establish probable cause.   Indeed, the agents had identified three Instagram accounts associated with Marshall and concluded two of them "resolved" to his home.  In the light of that detail, the fact Special Agent Dervish

switched up the accounts does not suggest intentional or reckless behavior.

In his objections, Marshall adds other points to his substantial showing argument. First he argues recklessness can be inferred from the fact the agent made the same mistake twice: in the warrant affidavit and when interviewing Marshall "to convince him to confess." (Dkt. 76 at 30.) The Court does not agree. She obtained the warrant the day before arresting and interviewing Marshall. That she had the same misinformation in her head two days in a row does not suggest intentionality or recklessness on either occasion. Perhaps Marshall's argument makes more sense if one believes she was trying to convince him to confess by misleading him. But, as stated above, the audio tape of that interaction does not support his allegation. Special Agent Dervish was not hostile or disrespectful to Marshall, overly aggressive in challenging his statement, or feeding him false information throughout the interview. Her demeanor in the interview—calm and professional— supports the Court's conclusion that no evidence suggests she intentionally or recklessly misrepresented the IP address.

Next, Marshall adds that the agent did not even send a subpoena

34

to Comcast for the "chill.beezy" account until after arresting Marshall. He does not explain how that helps his situation. Perhaps he suggests she could not have thought her statement in the affidavit was true because she had not yet subpoenaed Comcast. But, that's the point. She switched up the accounts. Finally, Marshall alleges the agent knew he did not live at the Atwood home until January 2024, "so IP login information relevant to any criminal conduct in March of 2023 could not resolve to that apartment." (Dkt. 76 at 30-31.) Again, that's a false trail to recklessness. As described in more detail below, agents tied the March 2023 sexual exploitation of a minor to Marshall in several ways, associated one of his phones to an area near the Atwood residence, tied Marshall's mother to that home as of January 2024, and tied Marshall to that home as well. Nothing in the affidavit suggests Marshall stopped using the "chill.beezy" account before moving into that home or that the IP information they had was linked to the time of the original conduct.

For these reasons, the Court overrules Marshall's objections and adopts the Magistrate Judge's conclusion the Marshall has not made a substantial preliminary showing that Special Agent Dervish intentionally or recklessly misidentified the Instagram account linked to

the Atwood home.

## 2. Probable Cause

The Magistrate Judge concluded that, even if Marshall made that preliminary showing, probable cause for the warrant still existed once the erroneous information about the "chill.beezy" IP address was set aside—thus precluding a *Franks* hearing. Marshall objects, claiming the affidavit failed to establish a nexus between Marshall's alleged crime and his home.

"Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (*quoting Illinois v. Gates,* 462 U.S. 213, 238 (1983)). For the search of a residence, law enforcement must establish "a reasonable basis for concluding [a defendant might] keep evidence of his [or her] crimes at his [or her] home, i.e., a 'safe yet accessible place.'" *Id.* In this regard, the Eleventh Circuit has explained:

> [t]he justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access

36

may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

*Id.*

Special Agent Dervish's affidavit established probable cause to believe evidence of Marshall's alleged crimes would be found in his house even excluding her misstatement about the IP address. Special Agent Dervish first presented significant evidence that Marshall used two social media accounts linked to his phones in March 2023 to sexually exploit a minor and to retain evidence of that crime. This included information that he used an Instagram account linked to one his phones (ending in 5301) to communicate with a 12-year-old girl, convinced her to film herself masturbating and send him the video, convinced her to film herself kissing and (separately) performing oral sex on her 4-year-old brother and send him the videos, and retained the videos (as he sent them back to the victim). (Dkt. 43-1 and 5-6.) The affidavit also established that he used a Snapchat account linked to another phone (ending in 4487) to send one of the videos back to the victim via Snapchat. (*Id.*) The agent then explained law enforcement connected Marshall and the 4487 number to the Atwood home in June 2024 through geolocation,

37

specifically that the results of a geo-location warrant showed Marshall's phone "routinely to be in a geographic location surrounding" the home. (*Id.*)  She also connected him to the home (1) in July 2024 through the registration of his mother's truck and information he lived with his mother, (2) in August 2024 through his mother's registration with the U.S. Postal Service, and (3) on August 2 and 6, 2024 through physical surveillance when officers watched Marshall leave the apartment building and walk to a Marta station.  (*Id.*)  This established probable cause to believe Marshall committed a federal offense involving the exploitation of children, that he kept evidence of that crime on social medial accounts linked to his phones (at least in March 2023), that he still had the 4487 phone, and that he lived at the Atwood residence—all without considering the erroneous information linking the IP address for "chill.beezy" to the home.  Marshall really does not dispute this.

To establish probable cause to believe evidence of Marshall's crime would be found in the home, she also relied on her knowledge, experience, and training that people who receive child pornography often maintain their collection of illegal images in the privacy and security of their home or some other secure location and keep that material for several years.

38

(Dkt. 43-1 at 11.)  She averred:

> [b]ased upon the conduct of individuals involved in the
> collection of child pornography . . . namely, that they tend to
> maintain their collections at a secure, private location for long
> periods of time, and that forensic evidence of the downloading,
> saving, and storage of such evidence may remain on the
> computers or digital media for months or even years after
> such images and videos have been deleted from the computers
> or digital media, there is probable cause to believe that
> evidence of the offenses of producing, receiving, and
> possessing child pornography, as well as enticement of a
> minor, is currently located in [Marshall's residence].

(*Id.* at 12.)

Marshall says the Magistrate Judge erred in relying on these "experienced based platitudes about the storage and collection" habits of people who possess child pornography.  (Dkt. 76 at 32.)  He says that, to establish probable cause, the affidavit should have included allegations about Marshall's specific internet activity showing his conduct was consistent with collectors of child pornography.  The Court disagrees. The Eleventh Circuit has said a magistrate judge can rely on an agent's expertise and training in approving a warrant.  *United States v. Carroll,* 886 F.3d 1347, 1351 (11th Cir. 2018) (noting affiant's "seven years of experience in the GBI and … special[] train[ing] in computer investigations involving crimes against children" in assessing probable

cause for search warrant). Marshall also identifies no reason a magistrate judge should not be permitted to rely on an agent's experience and expertise as one factor in assessing probable cause. He cites several cases but none of them involve anything like the situation here—an FBI agent's experience and training about the habits of people who possess child pornography. He cites, for example, *United States v. Olgesby*, 2019 WL 1877228, (S.D. Tex. 2019), in which a district court suppressed the search of a phone found in a car when a defendant was arrested for burglary. But, the affidavit presented no evidence a phone had been used in the robbery and relied exclusively on the agent's general statement that people who commit crimes often talk with coconspirators on the phone. That is not the case here, as Special Agent Dervish explained why she believes people who commit the crime at issue in this case retain evidence of their crimes in their homes. Marshall similarly relies on *In re Search of White Apple Phone*, 2012 WL 2945996, (S.D. Tex. April 11, 2012), a case in which a magistrate denied a warrant for the search of a phone belonging to an individual who failed to register as a sex offender. The affiant included no details to suggest the target committed any offense (other than not registering) and never "explain[ed] how access to

the cell phone [would] likely provide information regarding the criminal offenses. *Id.* at *2. Indeed, the magistrate judge in that case concluded the affidavit "failed even to establish a reasonable likelihood that an offense had been committed, not to mention the establishment of a nexus between the targeted cell phone and the purported criminal offense." *Id.*

Those cases are not helpful to Marshall. Special Agent Dervish provided the Magistrate Judge ample evidence that Marshall committed the child exploitation offense, that he used social medial accounts linked to the two phones to receive, retain, and transmit evidence of the crimes, and the basis for her belief that the evidence would likely be in the house (because people involved in these offenses often retain the contraband and keep it in a secure location like their homes). The affidavit also linked Marshall's 4487 phone near the home in June 2024. These facts distinguish the authority Marshall cites.

Based on the totality of the allegations in the affidavit, the Court adopts the Magistrate Judge's conclusion that the warrant established the constitutionally required nexus between the crimes Marshall allegedly committed and the location to be searched. The Court thus also concludes the warrant provided probable case—without considering the

misstated information.

### B.    Staleness and Overbreadth Attacks on the Warrant

Marshall next objects to the Magistrate Judge's conclusion that the 17-month gap between the time Marshall allegedly exploited the minor (March 2023) and the execution of the warrant (August 2024) did not render the warrant stale.    (Dkt. 76 at 34.)[10]    The Magistrate Judge relied—in part—on this Court's decision in *United States v. Maxson*, 2020 WL 703137, (N.D. Ga, Feb. 12, 2020), holding an 8-month delay between a defendant's distribution of child pornography and the execution of a search did not render the warrant stale.  *Id.* at *5.  In that case, the Court noted "staleness is an issue which must be decided on the peculiar facts of each case [including] the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched."  *Id.* (*citing United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018)).

---

[10] Marshall says the Instagram account "used in the criminal conduct was deactivated in March 14, 2023."  (Dkt. 76 at 34.)  He cites no authority for that assertion nor explains how it should be used to assess the constitutionality of the search within the four corners of the warrant. And, as discussed below, there is no claim the agents knew about that at the time.

Finally, the Court recognized "the Eleventh Circuit has followed the lead of other circuit courts in finding that the type of charges at issue here (the possession of child pornography) elongates the probative value of prior possession, keeping it fresh and preventing it from going stale as quickly as other evidence might. . . because 'pedophiles rarely, if ever, dispose of child pornography' and because evidence of child pornography can remain on electronic devices long after someone attempts to delete it." *Id.* (citing *Touset*, 890 F.3d 1238).

In his objections, Marshall suggests this case is different because no evidence linked Marshall's alleged crime to his home. (Dkt. 76 at 34.) He says the 17-month delay might be reasonable if "illegal activity had been more tightly connected to the residence." (*Id.*) But, as this Court noted in *Maxson*, the nature of the charges "elongates the probative value of prior possession." *Maxson*, 2020 WL 703137 at *5. And the Eleventh Circuit has rejecting a staleness challenged based on an 18-month delay between the time a defendant allegedly paid to receive child pornography and the date of a search. *Touset*, 890 F.3d at 1239. Again Special Agent Dervish's affidavit showed Marshall had the 4487 phone at (or near) his home in the month or so before the search. The Court adopts the

Magistrate Judge's recommendation and rejects Marshall's staleness challenge.

Finally, Marshall objects to the Magistrate Judge's conclusion that the warrant was not overbroad.  He argues it fails this requirement because it contains insufficient subject-matter or time limitations.  As to the first, he argues the listing of items to be seized in Attachment B, which includes all cell phones, electronic media devices, computers and computer software without regard to file type, is so broad as to render any limitation to the crimes under investigation "meaningless."  (Dkt. 76 at 35.)

The Magistrate Judge correctly rejected this argument because—regardless of the breadth of Attachment B—the first page of the warrant only allowed agents to seize items identified in the list that "constitute evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 18, United States Code, Sections 2251, 2252, 2252A, and 2422(b)."  (Dkt. 43-1 at 1.)  The Eleventh Circuit has held this limitation comports with constitutional requirements.  *See United States v. Brooks*, 648 F. App'x 791, 793 (11th

Cir. 2016) ("that some of the descriptions of the items-to-be-seized contained no express reference to child pornography or to the exploitation of children fails to render the search warrant impermissibly overbroad. When read within the context of the entire warrant, the descriptions are sufficiently particular to enable officers to 'reasonably ascertain and identify the things to be seized' as being *only* those items pertinent to an investigation related to child pornography").

Next, the Magistrate Judge concluded the agent's failure to include a time limitation did not render the warrant overbroad given the nature of the charges. (Dkt. 74 at 48.) Marshall objects "to the Magistrate Judge's conclusion that child sex cases eliminate the need for any time restrictions in a search warrant." (*Id.*) The Magistrate Judge did not hold that. He simply cited cases explaining that, given the fact people who possess child sex abuse materials "have a propensity to hoard and keep it indefinitely," the lack of a time restriction does not automatically doom a warrant. (Dkt. 74 at 39.) And Marshall cites no cases to the contrary. As explained above, the Eleventh Circuit has recognized that propensity. The Court concludes the lack of a time restriction in the warrant case does not render it invalid.

45

## C.    Conclusion

The Court agrees with the Magistrate Judge's conclusion that Marshall failed to establish his right to a *Franks* hearing.  The Court also adopts his conclusion that the warrant established probable cause (including a nexus to Marshall's home) and was neither stale nor overbroad.  So the Court adopts his recommendation and **DENIES** Marshall's motion to suppress the search of his home.

## V.    Motion to Suppress Search of Person and Phone

Law enforcement also obtained a search warrant for Marshall's person and any phone he had on him.  (Dkt. 42-1.)  It was the same as the warrant for his home in all material respects and law enforcement used it to seize and search the phone he was carrying on the day of his arrest.  Marshall filed a motion to suppress, saying the warrant failed to establish a nexus between any criminal conduct and items in his possession (specifically any cell phone).  (Dkt. 42.)  He also raised the same staleness and overbreadth arguments he raised in regard to the search of his home.  The Magistrate Judge adopted his conclusions regarding the latter two issues, addressed only the nexus attack, and concluded the warrant passed constitutional muster.  (Dkt. 74 at 41.)

46

Marshall objects.  (Dkt. 76 at 38.)

This Court also adopts its prior reasoning and overrules Marshall's staleness and overbreadth objections.  Regarding nexus, the Magistrate Judge concluded the affidavit established that Marshall used Instagram and Snapchat accounts associated with both the 5301 and 4487 phones to engage in conversations with a minor victim in March 2023.  (Dkt. 74 at 41.)  He determined Special Agent Dervish's averments, his prior conclusion that the warrant was not stale, and the special agent's experience that people who communicate about child sex abuse material maintain their collections established the necessary nexus between the crimes in March 2023 and any phone Marshall might have in his possession.  (Dkt. 74 at 42.)

Marshall insists the lack of evidence anyone used the phones to commit a crime after March 2023 rendered the information stale and precluded a link between the crime and any phone he possessed in August 2024.  As part of his objection, Marshall analyzes subscriber information the FBI received from T-Mobile and Snapchat.  According to him, the documents show the 5301 number linked to the "chill.beezy" Instagram account that communicated with the victim in March 2023

was associated with someone else from 2022 through 2024.  (Dkt. 76 at

39 (*citing* Dkt. 42-2).)  But it appears the FBI received that information

on August 19, 2024, after execution of the warrant.  (Dkt. 42-2.)  He also

says the "last active date" for the Snapchat account that was used to

communicate with the victim was March 4, 2023, "weeks before the final

communication."  (Dkt. 76 at 39 (*citing* Dkt. 42-3).)  He says the 4487

phone number was also removed from that account on March 4, 2024.

(*Id.*)[11]  But he offers no evidence to support his interpretation of the

---

[11] Marshall's observation regarding the 5301 number could be explained
by the fact Special Agent Dervish linked Marshall to the number via
Instagram rather than through T-Mobile.  Instagram identified the user
of the "chill.beezy" account as "Jabez Marshall", included the email
address "jabez.marshall@gmal.com", and listed the 5301 number.  (Dkt.
42-1 at 5.)  The point is whoever created that account listed that number.
And Marshall's observation about the Snapchat account may be wrong.
While the FBI report includes a "last active date" of March 4, 2023, it also
identifies the "Status" of the account as "Active."  (Dkt. 42-3 at 2.)  It
appears the discrepancy can be explained by the fact that, on March 4,
2023, someone "changed the number associated with the account" and
did not include a new number.  (*Id.*)  The same records Marshall cites
indicate he remained the subscriber to the 4487 number until the time of
the search.  (Dkt. 42-2 at 2.)  His suggestion the Snapchat account became
inactive in early March 2023 is inconsistent with Special Agent Dervish's
averment that the user of the account sent the illegal videos to the minor
victim on March 29, 2023 and that a subsequent subpoena to Snapchat
listed Marshall as the user along with his date of birth.  All of this shows
the danger of jumping to conclusions about the interpretation of

document (received by the FBI before it obtained the warrant). He says this "draws into question the validity of the data and certainly connections to Marshall." (*Id*. at 40.)

The problem for Marshall is that the Court must assess the validity of the warrant based on the allegations contained in the affidavit rather than in the light of subpoena responses the FBI received after execution of the warrant or based on documents for which Marshall offers no evidentiary explanation. *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) ("In passing on the validity of [a] warrant, consideration may be given only to information brought to the attention of the magistrate."); *United States v. Trader*, 981 F.3d 961, 969 (11th Cir. 2020) ("Probable cause exists if, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *United States v. Lott*, 2025 WL 784396, at *4 (11th Cir. Mar. 12, 2025) ("A reviewing court may consider only the information presented to the magistrate judge" who issued the warrant.).

---

documents without evidence and the importance of evaluating the warrant within its four corners.

The Court has already walked through the significant evidence in the affidavit tying Marshall to the phones, his use of social media accounts associated with the phones to sexually exploit the minor victim (including by receiving, possessing, and retransmitting images of the exploitation), and his continued use of the 4487 phone in June 2024. The Court agrees with the Magistrate Judge that this information and the other information Special Agent Dervish provided (including that people who engage in this conduct keep these kinds of images for years and that even deleted files can be recovered) established the necessary nexus between the crimes alleged and any phone Marshall might have in his possession at the time of his arrest.

The Court overrules all Marshall's objections, adopts the Magistrate Judge conclusions, and **DENIES** Marshall's motion to suppress this warrant as well.

## VI.   Motion to Suppress Search of Snapchat Account

Marshall moved to suppress a search warrant to Snapchat for information involving the "luv_life626" account—an account identified by Special Agent Dervish as having been in contact with the minor victim and linked to the 4487 phone. The Magistrate Judge concluded the

warrant was not overboard because, although Section B.I of the warrant required Snapchat to produce a large amount of data, Section B.II allowed law enforcement to seize only data associated with violations of child pornography laws involving Marshall (or the user of the "luv_life626" account) and information necessary to identify the user of that account. (Dkt. 74 at 43.) He also noted the warrant covered a short time frame—March 27, 2023 (when the user of that account communicated with the minor victim) through July 19, 2023 (the date of the warrant). (*Id.*)

Marshall objects, saying this two-step approach—first requiring production of a significant amount of information from the service provider and, second, allowing agents to seize a more narrow subset—violates the constitution. In support, he cites *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017). (Dkt. 76 at 41–45.) But the court in *Blake* discussed in dicta (and in unflattering terms) the expansive information the warrant required a social media platform to provide in a "first step," it did not find the warrant or the two-step process unconstitutional. *See Blake*, 868 F.3d at 974 ("[W]e need not decide whether the Facebook warrants violated the Fourth Amendment because, even if they did," the

warrants "fall into the good-faith exception to the exclusionary rule."). What's more, the warrant at issue in this case includes an important limitation that the warrant in *Blake* lacked: a limited timeframe for items to be provided. The court in *Blake* emphasized (among other things) that the warrant at issue "should have requested data only from the period of time during which" the suspected criminal conduct occurred. *Blake*, 868 F.3d at 974. The warrant here includes this very limitation by seeking Marshall's information from the day he allegedly messaged the victim (two days before the victim allegedly shared the sexually explicit video) until agents obtained the warrant several months later.

As the Magistrate Judge accurately noted "[f]ederal courts in this circuit and others . . . routinely uphold warrants requiring production of all information associated with a computer hard drive or email account in the face of challenges based on the particularity requirement, so long as the warrant limits seizure to relevant evidence." (Dkt. 74 at 45 (*quoting United States v. Addaquay*, No. 1:20-cr-126-LMM-JSA, 2021 WL 1541051, at *4 (N.D. Ga. Apr. 20, 2021) (collecting cases)).) In the absence of authority from the Eleventh Circuit and for the reasons

discussed above, the Court follows that lead, adopts the Magistrate Judge's recommendation, and **DENIES** Marshall's motion to suppress the warrant as unconstitutionally overbroad.

## VII. Application of the Good-Faith Exception

In *United States v. Leon*, the Supreme Court explained a court should not exclude evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *United States v. Leon*, 468 U.S. 897, 900 (1984). This good-faith exception applies in all but four circumstances: (1) where the issuing magistrate judge was misled by information in a warrant application the applicant knew was false or would have known but for reckless disregard for the truth; (2) where the magistrate "wholly abandoned" his or her judicial role; (3) where the affidavit supporting the application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) where the warrant was "so facially deficient" that officers couldn't have reasonably presumed it to be valid. *United States v. Taylor*, 935 F.3d 1279, 1291 (11th Cir. 2019) (internal quotation marks and citation omitted).

The Magistrate Judge addressed this issue but did not apply the good faith exception as an alternative ruling. Marshall insists Special Agent Dervish's misstatement about the IP address and the other challenges he raises in regard to each warrant preclude findings of good faith as to each warrant. (Dkt. 76 at 46.) Having consider the issue, the Court applies the *Leon* good-faith exception as an alternative basis for denying Marshall's motions to suppress each warrant.

No evidence suggests Special Agent Dervish intentionally or recklessly misled the issuing magistrate judges. That she misstated the IP address related to the home does not suggest that for the reasons already stated. The warrants also are not so lacking in probable cause or otherwise defective on their face to suggest the issuing magistrate judges abandoned their "judicial roles" or to suggest no reasonable agent could have believed them valid. Marshall's probable cause and overbreadth arguments certainly do not show such glaring deficiencies in the warrants for the reasons set forth above. And, in *Blake*, the Eleventh Circuit concluded the good-faith exception applied to avoid suppression of items seized pursuant to a "two-step" warrant that required Facebook to disclose to the government "virtually every kind of data that could be

found in [the defendant's] social media account." 868 F.3d at 974. The Court follows that approach here.

The Court concludes Special Agent Dervish acted in reasonable reliance on the validity of search warrants issued by detached and neutral magistrate judges. So even if the warrants are otherwise defective, the United States is entitled to the good-faith exception to suppression.

## VIII. Conclusion

The Court **OVERRULES** Marshall's Objections (Dkt. 76), **ADOPTS** the Magistrate Judge's Report and Recommendation (Dkt. 74) with the addition that the Court also applies the good-faith exception to suppression, and **DENIES** Marshall's Motions to Suppress his statements (other than pre-*Miranda* statements), the search of his home, the search of his person and phone, and the search of his Snapchat account (Dkts. 41, 42, 43, 46).

**SO ORDERED** this 13th day of March, 2026.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE